24-1039 Godfryd v. City of Newburgh Good day, Your Honor. May it please the Court. Michael Sussman, Sussman & Associates, Goshen, New York. This is an appeal from a grand summary judgment regarding two issues, the First and Fourteenth Amendment, which applied Godfryd termination. Godfryd was terminated in March of 21 by Donat, who was the city manager. Her direct supervisor, according to the record, did not recommend her termination. Donat cited no reason in terminating her, but at deposition, he claimed that Godfryd was insubordinate by working outside the scope of her duties and failing to follow directions. Was she still a probationary employee at that point? Well, she was a provisional employee, Your Honor, so yes. The answer to your question is yes. She was terminable at will. Okay, thank you. Just to be clear, we believe the termination referenced her speech acts, which themselves focused on racism in municipal housing and zoning policies. Donat, the city manager, viewed her statements as outside the scope of her duties and responsibility when she spoke about racism in the city's housing and anti-displacement programs. There are five instances of speech acts which we believe are operative here, though they're distanced. First, can I ask you about – you mentioned outside the scope of her duties, but really the test for speech, whether it's protected by the First Amendment, is whether it owes its existence to the job, right? That's a little bit different here because outside the scope means it shouldn't have gone into that report or whatever, but surely she was making these comments or the speech at issue was part of – it happened because of her job, right? I think the rule that I understood from the Lane case is that the matter could concern her job. In other words, the speech act that was constitutionally protected could concern her job but not be part of her job duties and function. I think that's a functional analysis. It's a bit distinct from what the court mentioned. I think the – The distinction, I guess, is between doing – part of doing the job or not doing it correctly and speaking as a private citizen. That's really the line. And so you're asking for kind of this line outside the scope of her duties because it was excluded. It should have been excluded from certain documents, and that's a little bit different from the speech coming from the job. I think there are two different speech acts here, to be fair. I think you're correct, Your Honor, with regard to three of the five speech acts that are involved. Two of them relate to setting an agenda for a meeting focused there on anti-racist policies of the city, the city manager indicating that's not part of her duty to set such policies or even to stimulate discussion of such policies. The first one – Your position is that her duties did not involve drafting agendas, grants, and scope of work? They didn't involve drafting agendas with that content. That's the point. So – and that was not known to her, but that's the position the city took, that they were concerned that the content of what she was doing with regard to the housing needs assessment – So you're asking us to draw a very fine distinction. It is a fine distinction. You are accepting and conceding that her job included drafting agendas, scope of work, and grants, but you are specifically focusing on the speech that she used in saying that that is therefore consistent with the citizen analog? Yes, because – well, that's with regard to three of them. Because any citizen could complain to the city with regard to its municipal policies and say that you're not fighting racism enough, which is essentially what she was doing in those three instances. When she included in the grant application – I'm sorry, you use that phrase very interestingly. I mean, is there, as a matter of law, a difference between speaking out against unlawful discrimination and not doing as much to fight racism? Because I see a little bit of a conflation. I don't think there's a conflation here, because what she was saying was that the city had a history of discriminatory housing policies, which doesn't seem to have really been disputed here, and it would be hard to dispute in a place like Newburgh, and that she believed the function of the planning department was to more aggressively deal with that. What she was basically being told by her supervisor initially, although it was never made entirely clear, was no, that's not what you're supposed to be doing here as a city planner. Okay. She took the position then later during the summer, and this is where I think the distinction that I was mentioning with the answer to Judge Park's question a minute ago. She took the position, okay, you're denying me, I'm not doing that. She stopped doing that. Then they have this meeting that's outside of her functions, really, which had to do with this code enforcement issue. She was in a meeting, but she hasn't – She was in the meeting just on her own time, out of interest? No, she was in a meeting because she's in the planning department, but it wasn't her responsibility, part of her job duties, to implement that project. Someone else was assigned to the project. She's at the meeting. During the meeting, again, there's conversation which she felt reflected a highly racist perspective. She mentions that and raises it in a series of e-mails. I take the position that has nothing to do with her job performance or function. She's not responsible for the project. She then is trying to extirpate comments and attitudes which she believed were centrally racist. She then has a conversation which I don't think has anything to do with her specific function. She then had a conversation with her own supervisor, Ms. Church, in which she indicates to Ms. Church that Ms. Church has been condoning and, in fact, represents a kind of implicit bias. Ms. Church gets very upset by that. This is in August. And, again, I don't think that is a job-related function of hers, any more than I think it's Matthew's function in the Matthews case to point out the problems with the police quota situation. Sir, can you highlight, and I apologize for this. No problem. It's just something very basic. Where is the live dispute of material fact? What I think we're having a—they're not disagreeing, I think, with what is happening. They're just saying it's within the scope of—that she wasn't a public citizen when doing it. So tell me what do you think is the disputed live material fact issue. Okay. First of all, it's a court question in a summary judgment motion like this. It's a judicial question, not a jury question, as to whether there is protected speech. So that's not going to be an issue. In other words, the parties have to agree on what the speech is, and then the judge has to determine whether that's constitutionally protected speech. If there's a dispute as to what speech acts occurred, that presents a fact question that a judge might not be able to decide. That's why Judge Kotel, in the Thomas Versogetes case, took the position that he saw a disputed issue of fact. It was clear to him that the statements that the woman made, as a social worker going to a prison and complaining about racism in the prison, were not part of her official job duties, and I believe that would be true of some of the statements by my client here. Okay, but you're conceding that they—that the tasks were part, the content wasn't, and they are not disputing the content. Is that correct? With regard to three of the five matters, Your Honor, is on point. The first two and the last one, which had to do with the grant application that Judge Parks related to. She was supposed to be filing an application. The question is, when she includes that there's an all-white architectural review commission or review board, and that draws the ire of the municipality, which it did. Church called her in and was very upset that she put that in the document. Is that a speech act which is a protected speech act? Okay, but even if you disagree that it is, there are still the acts I mentioned with regard to code enforcement, which, in answer to Judge Merriam's question I noted, was not part of her job function to make clear the nature of the racism which was underlying the administration and enforcement of that program and the attitude of her supervisor. That has nothing to do with her specific job function. Now, so when you—to answer your question, Your Honor, I don't think those issues, what happened in those meetings, are in factual dispute. But I think there are factual disputes. Here's the factual dispute. Assuming that any of that is protected speech under a Mount Healthy analysis, would she or would she have not been terminated? That is a question of fact that can't be determined at this level, and it would require a remand. Meaning, if the court found, contrary to what Judge Roman found, that there was, in fact, protected activity, then the question is, does that protected activity contribute to or cause her termination? We can't decide that at this moment, because the judge determined there was no protected activity, which I think is erroneous as a matter of law. So that's where the issue of fact would come in that would have to be dealt with on a remand. I see my time is up. If you have any questions, I'll address them. I saved two minutes. May I have one more question? Yes, Your Honor. Does the 14th Amendment claim rise and fall with the First Amendment claim? Absolutely not. As Vega recognized, they're distinct claims. Can you talk about the protected classes, or if she's not claiming a membership in protected class, what similarly situated individuals she was referring to? The 14th Amendment claim here is that she was opposing, opposing racial discrimination in employment, and under Vega put aside the issue of whether there's a comparator. That in itself is protected activity under the 14th Amendment, and she could not have been terminated for it, even if you found that it was not protected speech. Vega does not depend on a finding of protected speech. That's why there was a conflation, I think, by the district court and an error. Thank you very much for your attention. Thank you, counsel. You're reserved two minutes for rebuttal. Good morning, Your Honors. I may have pleased the court, Richard Zuckerman, Keenan Bean on behalf of the city of Newburgh, former city manager Joe Donat and Alexandra Church. To get right to the points that were raised by the panel, first off, the argument here that insubordination was outside of the scope of her duties is inconsistent with what the record actually shows. The direct quote from city manager Donat with regard to that language is, and this is the appendix at pages 379 to 380, quote, Plaintiff may have been working outside of her scope or without her department head's approval with securing community support, working with other stakeholders, and creating a narrative that would be competitive for funding purposes. That's what this record references with regard to the outside-of-the-scope issue. It has nothing to do with her speech. I agree there's no dispute of fact. This is a purely legal issue at this point. The specific issue, as has already been noted, is whether Ms. Godford's speech was part and parcel of her duties and so not citizen speech. If the court would like, I can go through each of the different aspects and show you where in the record it is clear that her speech owed its nature to her actual duties. I don't think you need that. You clearly know the record. What I will add is that there's no claim here that she was working off-duty. There's no claim that she did anything during her private time. There's no claim that she was talking to people outside of the city in terms of her complaints. Basically, what counsel is seeking to do is to expand the jurisprudence in this circuit and the Supreme Court to say that it's okay for a provisional civil servant who disagrees with what she is being told to do as part of her job to be able to choose the words that she uses. That's what this case is about. Ms. Godford was told you should not use specific words because they will be misunderstood and will cause problems in the larger context. If you want to use them, please talk with me and we'll either put them in context or we'll use other words. Instead, Ms. Godford chose to delete the words. So there isn't even a dispute about that. Nobody stopped her from complaining. She did complain within the city. She didn't complain outside of the city. Nobody told her she couldn't express her opinion. It was the specific words that she chose to use in furtherance of her job, which everybody agrees was covered, as the judge said, with regard to her planning and development responsibilities. So could she have written a letter to the mayor or a letter to the city manager or a letter to the editor of the local paper? Could she have done those things and just expressed her concern that Newburgh was not doing enough to limit segregation in the housing market or to limit the impacts of gentrification on certain communities? Could she have expressed those views in those avenues and had them be outside the scope of her work? She's not limited. Not everything she does is in the scope of work, right? Did she still have options to express herself? She did. The answer is yes, for example, writing to the newspaper. She had the opportunity to do that. She did not do that. In this record, her complaints were limited to coworkers by email, her direct supervisor, defendant, and church, the city manager, and the ultimate supervisor. That's it. There are no complaints to anybody else. I agree with you, Judge, or I'm not saying I should agree because you didn't express an opinion. But, yes, it's true. Had she written to the newspaper, perhaps we would be in a different situation. However, the district court didn't need to get there because of the fact that the court found as a matter of law that her speech was part and parcel of her job duties. So the court did not need to get to the civilian analog issue. That's where that would have come into effect if we had gotten that far. But, again, this record has literally nothing in it that supports any sort of a civilian analog argument on behalf of Ms. Godfrey. If the court has nothing else, I will stop there. Thank you, counsel. Thank you. We'll hear from everyone. Thank you. Three brief points. First of all, it's been clear since Frank V. Rellon and is entirely settled in this circuit that a complaint to a supervisor does qualify as protected speech. You don't have to go to the newspaper. There's absolutely no precedent in this circuit which indicates that that kind of speech act cannot be protected. Complaints to supervisors, as in Matthews, Matthews didn't go to the police academy, he didn't go to a newspaper. He spoke to his supervisors about the quota system, and that was deemed protected speech because it wasn't part of his duties. It's a functional analysis. So I don't think that point, with all due respect to my colleague, is particularly relevant. I don't think the fact that she could have taken other measures is particularly relevant because that's also not the standard. The question is whether the speech acts, particularly the speech acts with regard to the code enforcement and sweeps program and the comments made to Ms. Church about her own racist attitudes or racial attitudes, whether those would be deemed protected and constitutionally protected speech. Well, so what if we had a person who was trying to be hostile toward communities of color and the supervisor said the same thing to her? I don't want you to use that language in context. It will be difficult. Would that person still have? If that person was being fired for speech acts which were acknowledged as being outside of their job scope, which is to answer Judge Park's question, what the decision-maker here said. The question is what is outside the job scope? Is the outside the job scope the complaining or is the outside the job scope getting to be the decider about what words go in something being done under the city's name? Well, there's a paradox, but she said done under the city's name. If part of her job was to assess the housing needs study, which is the first example here, and she assesses the housing needs study and she comes to the position that it doesn't focus enough on racial segregation, to use Judge Merriam's term, or racism that's been historic in the city and is not being remedied. And she says that. And the manager says to her, though he didn't contemporaneously say this to her, he said it a year later, that's not your function. The function is city council function. So don't do that. Don't say that, which is what essentially happened here. The question is, is that speech by her protected or not protected? How can the city have it both ways? They could say, well, it's not protected because it's part of her job. But it's not part of her job. They're conceding it's not part of her job and they're criticizing her for imposing that as part of her job. See, they want to have it both ways, not me. You see, their explanation for terminating her is that she went outside of her job duties. Okay? She went outside of her job duties. And the same as in Thomas, what she's doing is engaging in protected speech. He said if they're not part of her job duties, she's speaking as a citizen about matters of public concern, which is indisputably what these matters are about. That's not part of this case. No one's arguing they're not about matters of public concern. It's a lot like the Giffen case, where the matters being spoken about, racial discrimination, and systematically in institutions, was deemed to be a matter of public concern.